The first case of this morning is PPC Broadband, Inc. v. Amphenol Corp. Counselor Robert High and Counselor Gabriel Bell. You may proceed, Mr. Chairman. Thank you, Your Honor. I'd like to reserve three minutes for rebuttal. May it please the Court, my name is Robert High, and I'm here on behalf of Appellant PPC Broadband. Across the four IPRs at issue on appeal, the Board made three critical errors. First, the Board found a motivation to modify the UTC reference without substantial evidence. Second, the Board based its decisions on evidence and arguments that Amphenol never argued and that are not supported by the evidence in the record. And third, the Board applied the wrong legal standard when analyzing and weighing PPC's objective evidence of non-obviousness. So the four IPRs on appeal involve four related patents that claim a connector for connecting a coaxial cable. Counselor, can we primarily look to the 063 patent and do the patents all rise and fall together here? Yes. So I think claim one of the 063 patent is representative for the issues on appeal. Across the four patents?  So I think we can consider that 063 IPR representative for the purposes of these issues. And so the 063 patent, as well as the others, they relate to a connector that connects these coaxial cables to an electronic device or another cable. And these coaxial cables, they carry data signals and they also have outer conductors that surround the data signal. And the conductive layer that surrounds the data signal within the coaxial cable helps keep electromagnetic interference from interfering with the signal. As long as the connector maintains that conductive layer from the coaxial cable to the port on the opposite end of the connector. Is that all the conductive layer does is provide a shield against moisture? It's moisture as well as electromagnetic interference. So when you have the ground shield completed, it kind of creates a sort of Faraday cage that helps keep out interference and things like that. And then there's also discussions about other components that, as well as the conductive layer that helps keep out moisture, which can lead to corrosion and can also impact whether the ground shield is complete. And so claim one of the 063 patent recites a conductive grounding portion comprising a compliant ring that is configured to provide an electric path between two specific components of the connector. And that's what the party's been referring to as a coupler in a body. And so Amphenol's petitions mapped this claim element to the UTC references O-ring 84. UTC has two O-rings. O-ring 84 is the smaller of the two. But Amphenol admits that this O-ring, or both O-rings, are not conductive. And so Amphenol's petitions argue that it would have been obvious to make these O-rings conductive and base this obviousness theory on using the O-rings to maintain a ground shield. This is this sort of continuous connection from the conductive layer to the port on the opposite side of the connector. Amphenol's petitions argued it would have been obvious to make these O-rings conductive to maintain this ground shield across the connector so that that ground shield exists if the connector is loose on the port. This obviousness theory is based on a faulty premise. Amphenol never included any evidence explaining how any of the components within UTC's connector that form this ground shield through the connector could break. And without that evidence, there's no motivation to modify these O-rings to be conductive. Wasn't there evidence in the record that there was a tendency or the potential for there to be breakage? Yes. So there is evidence in the record discussing these connectors generally in the industry. Not specific to UTC, but other types of connectors where it's what the parties in the briefing below called this loose connector problem. And it's this idea that if you don't tighten the connector all the way or if it gets loose over time, there can be these gaps between the components that form this ground shield. And you also admitted that below, right? So you agree with that statement? We agree that this loose connector problem was generally known. And we admitted that below. What we disagree with was that UTC suffered from this loose connector problem. It's got a different design than what the parties discussed when addressing this evidence of general knowledge about the loose connector problem. And in particular, it relates to the O-rings in UTC and their specific placement. And so what UTC says is, so the board recognized that UTC has this conductive ground shield already that goes through the connector. Dr. Dickinson testified to that effect. Yes, he admitted that. Why is that not substantial evidence at that point? So he doesn't provide any evidence as to how that conductive ground shield could break if the connector is loose. The evidence that UTC has the ground shield we think supports PPC's position that there's no problem to address, or at least there's no evidence of a problem to address, because UTC describes this conductive ground shield as soon as the coupler engages another connector. And UTC says that it has these O-rings that hold the connector components together. And there's no evidence that Amphenol provided below that these O-rings allow the components within the connector to form any gaps. And if there's no gaps between the components within the ground shield, then there's no problem with the ground shield and there's no reason to modify the O-rings to be conductive. So wouldn't they pose a look at this situation and say, well, there's no problem, but there's no harm in adding redundancy to this? So if there was evidence of that below, KSR could potentially have allowed such a theory if the evidence supported it. But that wasn't what Amphenol argued in its petition. It premised its motivation on there being this problem and saying that, well, if the connector is loose, you would just want to make these O-rings conductive so that you maintain the ground shield. And if you're going to premise your... That's true, though, right? If the connector could come loose, it would be good to have the ring to be conductive. So you would have a backup conductivity. If... That's a problem. And the combination solves that problem. If the ground shield and UTC could break, then that would be a problem. We're not necessarily agreeing that the specific solution would have been obvious. But what we're arguing on appeal here is that there's no evidence that UTC has this problem. You're arguing for some heightened standard of showing what a skilled artisan would look to as a problem to be solved and turning it into a mini trial on whether there's specific proof of that or not, rather than just having a skilled artisan suggest this prior art could possibly have a problem because if the connection comes undone, it wouldn't work. Here's how you'd solve that. I think where the evidence below runs into issues, though, is that UTC says that these O-rings hold the connector components together. And Amphenol's expert and the board haven't explained how UTC's O-rings can do that and yet the ground shield can break. And so that's... It sounds like an argument we've rejected over and over again, which is there's no need to modify the prior art because it works okay the way it is. And if the modification makes it better, then we've said that's a reason to modify it. There's also cases that we've cited, like the ArcticCat case in ArcticCat versus Polaris, where in the petition the petitioner premised the obviousness theory on a problem and the court said you haven't shown that this problem existed and so your obviousness theory is dead on arrival. And so that's kind of the realm that we're in here, is that to show that there is a reason to modify UTC's O-rings, you would need to show reason to do that because the board also recognized that there are these drawbacks of doing so. You would have increased manufacturing costs and reduced environmental sealing. And so the board, because it found a benefit... Was any argument made below that enabling the redundancy of the O-ring added additional costs and therefore it was a basis for a person who was skilled in the art to say, we're not going to do that? There's evidence below that making the O-rings conductive would increase manufacturing costs. The board actually found that. The board made a specific finding on that point. What the board said was there's no evidence as to how much more expensive it would be and given that it's not clear how much more expensive the benefits would outweigh the potential drawbacks in that situation. And so the board is kind of placing its thumb on the scale by saying that there are these benefits of making this modification, but it's doing that based on what we view as kind of the conclusory word of the expert without showing his work. Alternatively, we also say that the board erred in its analysis of the objective indicia of non-obviousness. And this goes to the heart of the obviousness combination here. And so in these petitions, Amphenol argued it would have been known to make these O-rings conductive to make this ground path for if the connector is loose on the interface port. Well, we submitted evidence that nearly eight years after the priority date of these four patents on appeal here, Amphenol filed its own patent application. And in that background, it argued that, well, there's this need that exists to create this alternative grounding path so that if the connector is loose, you have a backup grounding path. That was an interesting argument, but it seems to me, at least it raises questions in my mind, as to whether it's an appropriate objective indicia non-obviousness argument. Because you're talking about a former patent, whereas the indicia that is in the statute and in our jurisprudence is that of industry praise and things of that nature, commercial success, industry praise. Right. So cases like KSR, they're not really specific about trying to categorize this objective evidence in a particular bucket. The fact that they filed for a patent that also was obvious and invalid is somehow secondary considerations. It's evidence that people in this industry did not recognize. It's evidence from one competitor that it wanted to get a patent on something that may or may not have been valid. And the characteristics. Even if we accepted that patent filings that never resulted in a patent can somehow be secondary considerations, then wouldn't we require more than one straight patent application? Well, I think what makes this one particularly pertinent is that the reason why the claims were initially rejected was based on anticipation of using a reference that is within the same family as these four on appeal here. And so it's not just that this patent that they filed was invalid. It's that the examiner used one of PPC's related patents in this case and said this is already anticipated. It's showing that PPC was well ahead of where Amphenol was several years later in recognizing this problem and proposing the solution that years later Amphenol says would have been obvious. Counselor, you're into your rebuttal time. Do you want to reserve it? I would like to reserve. Thank you.  Good morning, Judge Ray. May it please the Court. Gabe Bell for the Appellee Amphenol. PTAB's decision here, supported by substantial evidence, should be affirmed. PPC essentially invites the Court to reweigh the evidence and to look for a hyperspecific motivation to combine. And this Court has rejected both of those notions. First, as to the Board's fact-finding of a motivation to combine, it's well-supported. And I think it's worth resetting the stage a little bit. And, for example, on page 38 of the Board's decision, it puts side-by-side the UTC prior art and the claimant issue here. And I'm kind of reminded of the old children's game of spot the differences between the two things. And really, I had a hard time doing that. And there's no dispute in this case that UTC discloses everything except the fact that its ring is not conductive. So we're left with the question, would there be a motivation to provide conductivity through that ring? And I think the record amply supports that. It's an insurance-type rationale. It's a backup. It's the same reason I carry a backup charger for if my battery goes out on my laptop. Same reason we have backup generators in our houses if the power goes out. It's the same sort of notion. And the petition set forth that, and the Board found it was supported by Dr. Dickens' testimony and by the two other prior art references that specifically disclosed having a redundant backup conductivity path. HORAC, for example, includes a backup redundant ring conductivity path. It says that the normal way of operation would eliminate everything about RFI interference. That's those phases 37 and 39 in HORAC. But it says for additional security, quote, additional security, you'd go ahead and make this as a preferred embodiment, turn the conductivity from off to on in that ring. So that shows right there, and that goes back to 1975. I mean, this is decades, decades of well-established prior art. It's reinforced by Leonetto, which likewise talks about having a secondary path in addition to the spring that provides the path. It says you can also, to guard against misalignment, you would have a rubber conductivity path as well. So the Board's decision on motivation to combine is amply supported. It was presented in the petition. And the notion that UT can't break, that it's somehow a perfect conductor, I just don't think is borne out by the record or in kind of common understanding. The opposing counsel talked about that it was well-known about this kind of loose connector problem, but that wasn't a specific problem that you'd see would suffer from. Can you respond to that? Sure. So the statement we're talking about was where PPC recognized that the problem of loose connectors had haunted the industry for years. And they said even up to 2009. And so this is at page 64, note 12 of the Board's decision where it credits the statement. And it's quoting their appendix page 5336. I'm inserting the appendix page, obviously. It's quoting PPC's prior statement. And in that prior statement at that page, it says it haunted the industry for years up to 2009. And that includes UT. UT was 2000. So PPC was recognizing, and we've also pointed to other statements, admittedly not presented in the Board proceedings below, where they specifically acknowledge that UT has a problem of loose connectivity. And it makes sense. That's the reason that Horak, decades before, provided another path. That's the reason that Leonetto provided another path. There's no real mystery to this. It's an insurance or backup type rationale. As for the secondary considerations, I think the Board was well within its authority to consider it, which it did. It fully considered the statements that they presented that Amphenol had previously argued for non-obviousness over other prior art not at issue here. And the Board recognized that that doesn't say anything about the view of somebody over the prior art presented here. UT, Horak, Leonetto were not at issue in that case. And, as the Court has noted, that application was denied. So it was found obvious. So if anything, that's an indicia of obviousness, not non-obviousness, let alone the fact that you have in the prior reexamination proceeding this Board found over this exact combination that was obvious. That claims very similar to these in the same patent family were obvious precisely for the rationale the Board found here. Now, that's a collateral estoppel argument that the Board didn't need to reach and didn't. But it provides additional context. The Board wasn't writing on a blank slate here, either in the prior art or in its own proceedings. It was well within its authority to find these claims obvious. One final note on secondary considerations. It's not our position that you could never consider these type of statements. It's just that the Board did so here and found them minimally, if any, providing any insight into what the normal secondary considerations would be. Praise in the industry, commercial success, failure of others. None of that was presented here. And the Board recognized that what was presented here was minimal at best and certainly didn't overcome the very strong side-by-side comparison of UT to the claims along with the other prior art. We think the Board's decision is well supported and should be affirmed. And unless the Court has further questions. Do you agree just with the housekeeping question? I asked opposing counsel that we could focus on claim one of the 063 patent, and that would be representative across all the patents? Yes, absolutely. They acknowledged that in their blue brief, and we certainly agree with that. Unless there are further questions, I respectfully ask the Court to affirm. Thank you. Thank you. We'll go back to three minutes. Yes. Thank you, Your Honor. Briefly, so Amphenol discusses the Board's findings regarding the Horak reference and the Lionetto reference. If you look back what they say about those references and their petition, all they're relying on those references for is the existence of a conductive elastomer. That's the only thing that they relied on it for. That's the only thing that their expert discussed about it, aside from just providing a high-level overview of the reference generally. And the Board kind of went rogue, we think, in making its own analysis based on these references and materially changed some of the disclosures in those references. If you look at Horak and its discussion of that reference on Appendix Pages 59 and 60, it's changing the quotes in a way that changes the meaning of those, and it's using those as kind of a foundation to fill in the evidentiary gap that Amphenol's petitions left here. When you say changing the quotes, are you indicating that you think that they're not quoting, the Board wasn't quoting things properly on Appendix Page 59? What I mean is they quote, and then they stop quoting, and then they use their own words, and then they start quoting again, and where they stop quoting, they're replacing those words with words that are not synonyms. If you look at Horak, Horak is discussing problems with- You're saying the disclosures don't say what the Board says they say. Correct. That's a substantial evidence issue. Well, if you look at the disclosures, I mean, that is, I agree, a substantial evidence issue. I think what goes beyond that is the Board is also relying on disclosures that are not cited, and I think that gets into APA territory. Well, it gets into APA territory if they're creating new grounds. It doesn't get into APA territory if they're looking at the reference for further evidence, does it? We've made that distinction pretty clear. Right. You can't come up with a new combination or the like, but you can cite two other portions of a previous cited reference to support the decision, and isn't that what they're doing here? In our view, they're creating a new motivation that the Amphenol petitions did not. It's not the same motivation. It's to solve conductivity problems. So they kind of flip it, is how we view it, is that they're saying that these secondary references disclose these benefits, and it would be obvious to incorporate these benefits. Their petitions do the opposite, where the petitions say there's this problem. You would just look to these elastomers, and a person of ordinary skill would know that you can use those to do this function. So it's kind of the reverse of what they argued in the petition. And lastly, just really briefly, the secondary considerations analysis, do you mind if I just finish this one sentence? The secondary considerations analysis, regardless of your view of the weight of the evidence, it was just legally wrong. The board basically rejected the evidence because the inventors did not provide their own opinions of the combinations in the petition, and that's just not how we treat secondary considerations in any other category. Thank you. Thank you. We thank the parties for their arguments.